57 So.2d 750

STATE ex rel. DUGAS v. LEHMANN et al.

No. 40742.

March 18, 1952.

Opinion March 21, 1952.

865

866

C. William Bradley, Norco, Fred A. Middleton, New Orleans, for defendant-appellant.

John E. Fleury, Gretna, and James P. Vial, Hahnville, for plaintiffs-appellees.

HAMITER, Justice.

In compliance with the provisions of LSA–R.S. 18:364, subd. E, requiring a decision in cases of this character within 24 hours after submission, we herewith hand down our decision in this matter, the reasons for which will follow in due course.

For the reasons to be hereafter assigned the judgment appealed from is annulled and set aside, and there is now judgment rejecting the demands of plaintiff and confirming the action of the St. Charles Parish Democratic Executive Committee in certifying the defendant, Bryan J. Lehmann, Jr., as the Democratic Party candidate for the office of Member of the House of Representatives for the Parish of St. Charles, State of Louisiana. Plaintiff shall pay all costs.

MOISE, J., dissents and will assign reasons.

LE BLANC, J., absent.

Opinion

HAMITER, Justice.

In a second primary election held on February 19, 1952, Horace J. Dugas and

Bryan J. Lehmann, Jr., sought the Democratic nomination as Member of the House of Representatives in and for the Parish of St. Charles.

At 12:00 Noon of Saturday, February 23, 1952, the Democratic Executive Committee of that parish met and officially promulgated the returns of the election, the promulgation disclosing that the votes received by the respective candidates were as follows:

Bryan J. Lehmann, Jr.,     2729 votes
Horace J. Dugas    .   .   2684 votes

Thereupon, the Committee declared Lehmann the Democratic nominee and ordered his name certified to the Secretary of State to be placed on the official ballot for the general election. To this Dugas, appearing through counsel, protested in writing; and he gave notice of his intention to contest the election.

The Committee concluded its work and adjourned about 12:25 p. m. of said Saturday, February 23, 1952. At 1:50 p. m. of Monday, February 25, 1952, Dugas instituted this suit.

The petition contains allegations, among others, as follows:

"That in the First Ward, First Precinct, of the Parish of St. Charles, after the closing of the polls, and the tallying of the votes were started by the commissioners, duly selected as election commissioners for said precinct and ward, the commissioners refused to count fifty-one ballots, which were declared spoiled by three of said commissioners and which said commissioners refused to count, and which your petitioner alleges were good and valid ballots voted for in favor of your petitioner and should have been counted and which should now be counted and credited to petitioner.

"That if all of the alleged spoiled ballots described in the foregoing paragraph had been properly counted your relator and petitioner would have been nominated as the candidate of the Democratic party for member of the House of Representatives for the Parish of St. Charles, State of Louisiana, and that in accordance with [LSA–]R.S. 18:364, he has reason to believe and therefore alleges upon information and belief that a proper re-count of the ballot box in the First Ward, First Precinct, of the Parish of St. Charles, State of Louisiana, if properly counted would change the results of said election and would show that your petitioner, Horace J. Dugas, would receive the majority of the legal votes cast at said election, and that petitioner is entitled to be the nominee of the Democratic party for the office of Member of the House of Representatives for the Parish of St. Charles, State of Louisiana, and that he should be adjudged to be so certified.

"Your petitioner alleges that he desires a re-count of the ballots of the above described box in the First Ward, First Precinct, of the Parish of St. Charles, State of Louisiana, and that he accompanies this petition with the sum of Twenty

and 00/100 ($20.00) Dollars, to cover the cost of re-counting said votes and that this Court name sufficient counters to conduct said re-count."

Plaintiff prayed that sufficient counters be named to conduct the recount of votes; that this suit be tried summarily; and that an alternative writ of mandamus issue directing the St. Charles Parish Democratic Executive Committee to meet and amend its promulgation of the returns of the second primary and certify plaintiff as the Democratic nominee for the office of Member of the House of Representatives to be voted for in the general election on April 22, 1952.

Responding to the suit, defendant first filed a plea of prescription of two days, a plea to the jurisdiction of the court ratione materiae, and exceptions of no right and no cause of action. All were overruled.

In his answer defendant denied generally and substantially the allegations of the petition. Alternatively, he averred that certain described votes cast and counted for plaintiff in said Precinct One of Ward One were illegal. He prayed for judgment confirming the action of the Committee and rejecting the demands of plaintiff.

During the trial of the merits there was ordered and held, over defendant's objection, a recount of the ballot box of Precinct One of Ward One. And, following the recount, the district court concluded that in such box plaintiff Dugas and defendant Lehmann had received, respectively, 417 votes and 342 votes, instead of 356 votes and 336 votes as previously reported by the Commissioners of Election.

Taking into consideration the tabulation on the mentioned recount, the court rendered a judgment recognizing plaintiff Dugas as having received in the second primary election throughout St. Charles Parish a majority of 10 votes over defendant Lehmann (Dugas 2745 and Lehmann 2735), and ordering the Parish Democratic Executive Committtee to meet, to amend its promulgation of the returns, and to declare Horace J. Dugas the Democratic nominee as Member of the House of Representatives for St. Charles Parish.

From this judgment defendant Lehmann is appealing.

Appellant complains here that the district court erred: (1) in overruling the plea of prescription of two days, the plea to the jurisdiction ratione materiae, and the exceptions of no right and no cause of action; (2) in overruling his objection to the recount of the ballot box, the ground for which was that plaintiff had not satisfactorily shown that such box had not been tampered with; (3) in allowing and counting 21 votes which had been protested for the reason that the voters had received assistance in marking their ballots notwithstanding that they were able to read and write; (4) in allowing and counting 51 ballots that had been rejected and marked

"spoiled" by the Commissioners of Election because each such ballot had at least two tears on a side thereof; (5) in allowing and counting one ballot which had a tear in the center and another on the top.

Only the mentioned fourth complaint need be discussed herein. It is meritorious, in our opinion; and the litigants agree, as they must, that by the disallowance of the torn 51 ballots (of which 50 were cast for Dugas and one for Lehmann) the defendant Lehmann should prevail in this litigation, he having been unsuccessful by only 10 votes in the recount in the district court which included such ballots.

■ On the subject of marked ballots the following pronouncements are pertinent:

"The law and the courts as well are no doubt ever zealous in guarding the secrecy of the ballot, and that is why a ballot which bears any distinguishing mark by which it may later be identified and thus lend encouragement to bribery and corruption in elections will be rejected. A distinction, however, has to be made between such a mark and one which, on the other hand, merely indicates the attempt of the voter to correct a mistake honestly made by him in marking his ballot, for again the courts and the law are equally as zealous in safeguarding and protecting the right of the voter to cast his ballot and to have it counted." Hebert v. Landry, La.App., 193 So. 406, 408; Courtney v. Abels, 205 La. 559, 17 So.2d 824.

"A distinguishing mark prohibited by the law is such a mark as will separate and distinguish the particular ballot from other ballots cast at the election. It is some sort of mark put on a ballot to indicate who cast it, and to furnish means of evading the law as to secrecy. * * *" 9 Ruling Case Law, Elections, page 1136; Courtney v. Abels, supra.

"A distinguishing mark need not be made by means of a pen or pencil, but may consist in the peculiar way in which the ballot is folded or creased, in the folding of something within the ballot, or in its being cut or mutilated." 29 C.J.S., Elections, § 185. (Italics ours.)

■ The tears on the sides of the 51 ballots in question could well constitute distinguishing marks intended for identification purposes. In depth or length they range variously from a quarter inch to about one inch. Each ballot contains at least two tears; some ballots have four. And the ballots appear to have been torn individually, for with respect to the locations of the tears no two are identical. Moreover, as the hereafter quoted contentions of the litigants indicate, it is certain that the tears were executed deliberately, not accidentally.

Defendant, of course, claims that the ballots were torn by the respective voters with the view of distinguishing them. To quote from the brief of his counsel: " * * The mutilation of the 51 ballots by tears,

* * * sets up a pattern of distinction that set off each of the 51 ballots as being easily distinguished and separate from the rest of the ballots in the box. * * * "

Plaintiff, on the other hand, insists that some unscrupulous election official was the guilty person. In the brief, his counsel say:

"An examination of these ballots will reflect an attempt by some dishonest, corrupt and unscrupulous person serving at the poll to disfranchise and deprive the citizenry of their sacred right to vote and exercise their right and privilege of selecting their public officials.

"The tears on these ballots are similar, they in no way can be considered as a mark of identification, mutilation or distinguishing mark or marks. It is evident that the tears were made by a person other than the voter in an attempt to destroy his ballot and not to identify it."

■ From only an examination of the 51 ballots (a careful one has been made by us) we cannot conclude as plaintiff's counsel would have us do. The tears are very similar, although not identical as above stated, and the similarity justifies the belief that they resulted from an illegal plan. But whether that plan involved an alleged dishonest election official, as plaintiff insists, is a question not determinable from the ballots alone.

■ As stated in 18 Am.Jur., Elections, § 302: "It may be presumed that election commissioners will legally discharge their official duties. The election returns and certificate of election are presumptive proof of the result of an election, which will prevail unless rebutted by proper evidence. Again in 29 C.J.S., Elections, § 274, we find: "Every reasonable presumption will be indulged in favor of the validity of an election. The law presumes that elction officers perform their duty honestly and faithfully." Appropriate also are the following observations in Evans v. Reiser, 78 Utah 307, 3 P.2d 253, 254: "* * * It is clearly the duty of the judges of election to refrain from marking the ballots. In the absence of proof to the contrary, we must assume that they have performed such duty. Indeed, unless we may rely upon such presumption (in the absence of proof to the contrary), we are at sea as to all of the ballots which are brought here for review. The very essence of this proceeding both here and in the court below is bottomed upon the presumption that the marks upon the ballots being examined were placed there by the voter, otherwise the whole proceeding would be a farce. If the judges of election marked any of the ballots or wrote any words or figures thereon, such fact could doubtless have been established by direct proof as was done with respect to some of the ballots. In the absence of such proof, we must of necessity assume that the words and figures upon the ten ballots were placed there by the voters who cast those ballots."

■ In the instant case it is presumed that all of the election officials at Precinct One, Ward One of St. Charles Parish acted honestly and faithfully in the performance of their duties. And the record before us contains no legal evidence whatever to rebut that presumption.

True, in an unsworn written protest purportedly submitted by two of the five election commissioners when the 51 ballots were declared and marked "spoiled" it was said that the ballots, from all indications, show that the tears were not made by the voters but by one person handling them. However, this writing, even if it were legal evidence, could not overcome the existing presumption. It, like the above quotation from the brief of plaintiff's counsel, constitutes nothing more than the expression of an opinion, a conclusion, or a suspicion based solely on the appearance of the ballots. Had the two commissioners possessed actual knowledge of any misconduct on the part of any other election official they, undoubtedly, would have been called by plaintiff as witnesses to give their sworn testimony concerning it. This was not done.

There being no legal evidence whatever to rebut the mentioned presumption, it must be assumed that the tears on the 51 ballots, rejected by the Commissioners of Election, were made by the respective voters as distinguishing marks. Accordingly, we hold that the district court erred in allowing and counting those ballots, and

that defendant Lehmann should prevail in this action.

MOISE, J., dissents and has assigned written reasons.

LE BLANC, J., absent.

MOISE, Justice (dissenting).

I cannot subscribe to the majority view because of the facts of record and those proven by the senses. The tear on the ballot was made not to identify the voter but to disenfranchise him. This is the affirmative and positive side. Fifty-one ballots were designated as spoiled, fifty of these were for Dugas and one for his opponent. Each ballot shows on its face self-evident fraud designed to destroy the will of the elector. Where fraud is self-evident no presumption should be indulged in. The description of the tear was properly made by the able organ of the court in the majority opinion, but the error of the majority view is that the secrecy of the ballot has not been invaded because a distinguishing mark has been defined by judicial authority as one put on a ballot so as to indicate who cast it. 9 Ruling Case Law, Elections, page 1136; Courtney v. Abels, 205 La. 559, 17 So.2d 824. An examination of the ballots will bear this statement out and we say that such a prognosticator as Anna Eva Fay or sleight-of-hand artist Houdini could not identify the voters casting the fifty-one ballots in question. The trial

judge who saw and heard the witnesses reasoned that the tears could have been made by forcing the ballots into the box with a pencil. The two election commissioners who filed protests for the throwing out of the fifty-one alleged spoiled ballots felt that the tears were made not by the voters but by the persons handling the ballots. The rule of evidence should apply here that circumstantial variety coupled with substantial unity is the strongest kind of evidence. Here, we have a despoiler of ballots whose identification is unknown—but fifty-one electors must be disenfranchised, and a candidate has been caused irreparable injury because the votes cast by the electors are not to be counted as cast.

The Revised Civil Code provides a safe rule for interpretation and that is to look for the cause that induced the Legislature to enact the law. The admitted cause for enactment of the law was for the purification of the ballot, and, in such an examination we ask ourselves, does the judgment aid or hinder that purification. "The letter killeth, but the spirit maketh alive." Article 1945 of the Revised Civil Code provides that in contracts the intent must be determined by the language used, provided that the construction given does not lead to absurd consequences. It seems therefore that this rule should be a proper one to apply to the construction and interpretation of statutes. Here, the Legislature's intent was purification and here the consequences of the decision impose a death penalty by disenfranchising fifty-one electors, (who in no way contributed to the cause) as well as by making a lame duck of the candidate for the seat in the Legislature. Responsibilities for events are often God's, but, consequences of decisions are ours.

I respectfully dissent.